NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DAN ISRAELI, Individually and on behalf of all others similarly situated, : | Civil Action No.  04-cv-4305 (PGS) |
| Plaintiffs, : | |
| v. : | |
| Team Telecom International, Ltd., Team Software Industries, Ltd; Meir Lipshes, Shlomo Eisenberg and Israel Ofer, : | **OPINION** |
| Defendants. : | |

**SHERIDAN, U.S.D.J.**

This matter comes before the court on a motion to dismiss the Consolidated Class Action Complaint by defendants, Team Telecom International, Ltd., Team Software Industries, Ltd., Meir Lipshes, Shlomo Eisenberg, and Israel Ofer, for failure to plead with particularity pursuant to Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA").  The Complaint has been voluntarily amended by plaintiff to meet the substantially heightened pleading requirement under PSLRA.  Despite that effort, the Court finds that plaintiff has failed to meet the heightened pleading requirement.  As such, the Complaint is dismissed with leave to amend with greater specificity within 30 days.

I.

Team Telecom International Ltd. ("TTI") is an Israeli corporation headquartered in Petach Tikvah, Israel.  The stock is traded over-the-counter and, as many tech stocks, it is considered risky.

TTI is a provider of network management systems, operations support systems and business support systems for communication service providers.  On February 6, 2002, TTI issued a press release announcing a contract with Hutchinson, the United Kingdom's largest 3G mobile phone license holder, to provide technology for the 3G state-of-the-art platform.

According to a Company Note, the UK portion of the implementation was estimated to generate in excess of $15 million.  The markets beyond the UK were believed to have the potential to be worth approximately $60 million over three years.  Following the February 12, 2002 press release, TTI's stock price rose from a Class Period starting close of $28.71 to a Class Period near-peak close of $33.25.

Thereafter, in TTI's 2001 Annual Report, dated March 31, 2002, TTI, according to plaintiff, touted its ability to cater to the requirements of its customers, such as Hutchinson 3G, who were employing the latest generation of technology.  The report stated:

> The Netrac OSS suite is built to manage service providers' existing network infrastructure and hosted services, and support their transition into the next-generation world of IP, broadband, 2.5G and 3G technologies.  Using Netrac OSS, service providers can leverage existing legacy infrastructure as well as take advantage of next generation communications technologies.

Plaintiff maintains that the product and technology sold to Hutchinson did not exist.  In support of this contention, the plaintiff presents Confidential Witness 1 ("CW1"), a former TTI European sales manager employed by TTI during the Class Period.  During that time, CW1 allegedly met regularly with Lipshes and other senior sales employees about 5-6 times per quarter.  Among the issues discussed was the "failed Hutchinson project."  According to CW1, "the failure arose from the fact that TTI lead Hutchinson to believe that TTI would provide 'packaged software' and 'standard products' to implement its contractual obligations.  However, in reality, TTI had no such

components available to use since the Hutchinson 3G deal represented a type of project which TTI had not had prior experience in fulfilling." (Complaint, ¶ 41)

In the Class Action Complaint, plaintiff offers CW2, an employee at the Israeli subsidiary of Hutchinson Whampoa Ltd., Huchinson's parent corporation, who was among the top technology personnel at the company. In 2000, CW2 was assigned the task of defining the specifications of the network management system needed by Hutchinson 3G. CW2 believed the system sought was "overly ambitious" and "likely unfeasible."

CW4 is identified as a Senior Test Engineer at Hutchinson from April 2002 through March 2003, who worked directly with the implementation of the TTI system at Hutchinson. It is alleged that CW4 attended weekly meetings with TTI employees regarding the testing and progress of implementing the TTI software. This witness claims that TTI's product exhibited critical problems with configuration and functionality. CW4 further stated that the quality of the software supplied by TTI was not at the level TTI had promised. According to CW4, TTI lacked the knowledge and skill to provide appropriate solutions to the problems that arose. TTI, as stated by this witness, led Hutchinson to believe that the product to be provided was an "off-the-shelf" product with developed technology. However, as time passed, it became apparent that the technology promised was untested and was being developed from scratch. This conclusion was based on CW4's observation of the frequency and magnitude of the problems experienced with the TTI product, TTI's inability to resolve the problems, and CW4's prior experience with complex software products. CW4 stated that eventually, the Hutchinson software testing team made the recommendation not to accept the TTI product in its then-present state.

CW5 was hired specifically for the Hutchinson contract because of the problems TTI was

experiencing.  Working as a Test Manager for TTI, CW5 was allegedly responsible for teaching TTI what Hutchinson wanted and needed out of the product and to ensure that each phase of the product was delivered.  According to CW5, Defendants Lipshes, Shlomo Eisenberg (Chairman of the Board of Directors), and Israel Ofer (Chief Financial Officer) visited the Hutchinson job site on multiple occasions to attempt to fix the problems encountered.  CW5 claims that TTI misrepresented the time required to complete certain phases of the project and that TTI often failed to inform Hutchinson of known delays.  Furthermore, this confidential witness claims that the designers assigned by TTI to the Hutchinson project lacked the skills necessary to create the promised software product.

Plaintiff also presents one of TTI's Project Quality Assurance Managers, CW6, who was employed from February 2002 through August 2004.  This confidential witness participated in quarterly global conference calls conducted by TTI, which included participants from both Israel and the United States.  CW6 recalls Defendants Lipshes and Ofer speaking during the conference calls.  Lipshes, during one such call, allegedly stated that projects were being booked as they were signed by the company.

On May 12, 2002, Lipshes issued another press release, stating:

> Customers are also showing an interest in our OSS solutions to manage their new service offering and ensure the highest quality of service possible.  This quarter we were awarded contracts from new customers including two from Hutchinson 3G as well as follow-on orders from existing customers in North America and Europe.

In August 2002, defendants conducted a conference call during which it was stated "that the project with Hutchinson was proceeding smoothly."  Plaintiff claims that based on these alleged misrepresentations, TTI's stock price closed up 9% that day at $15.25.

On October 1, 2002, defendants issued a profit warning.  The profit warning, however, was

not attributed to any problems with the Hutchinson contract. Rather, Lipshes stated that the warning was caused by TTI's unexpected delays in signing new contracts. Plaintiff claims that defendants, in a conference call conducted on the following day, reassured investors that the Hutchinson contract was progressing as scheduled.

The following month, however, on November 12, 2002, TTI issued its actual third quarter earnings and a net loss of $6.1 million. Lipshes, while not identifying the Hutchinson contract specifically, stated that "[o]ur weaker-than-expected performance for the third quarter was due primarily to information developed over the past few days that has raised concerns regarding the continuity of a customer implementation." On November 14, 2002, in another press release, TTI announced that is had received a letter of termination from a "significant customer." On that day, the last day of the Class Period, TTI's stock closed at a Class Period low of $4.12.

TTI's SEC Form 20-F (Annual Report of a Foreign Private Issuer) filing for the fiscal year 2002 indicated that TTI moved for an injunction to prevent Hutchinson from calling on the performance bond. On January 23, 2003, an order was issued denying TTI's request for an injunction.

II.

In broad terms, the Complaint alleges that certain public statements made on February 6 and 12, 2002 by defendant Team Telecom International, Ltd. (TTI) induced plaintiff to purchase its stock. Plaintiff alleges that at that time, the defendants knew the statements were materially false giving rise to Exchange Act violations, particularly Section 10(b) and Rule 10(b)(5). The TTI statements concerned a contract with Hutchinson for services to develop or provide software to the telephone communication industry. Plaintiff further alleges that during the spring and summer of

that year, defendants continued to claim success despite knowledge of substantial problems with the implementation of the Hutchinson contract.

On October 1, 2002, TTI issued a profit warning, but it did not specifically mention the Hutchinson contract. Thereafter, on November 12, 2002, it reported a substantial loss for the third quarter. On November 14, 2002, TTI announced that it lost a "significant customer".

In addition to the misrepresentations and omissions, plaintiff claims TTI overstated its revenues because it failed to follow generally accepted accounting practices (GAAP).

### III.

Plaintiff's Complaint lumps all of the defendants together and treats them like a group. This includes TTI, the corporate officers, and the largest shareholder, Team Software Industries. Plaintiff argues "it is appropriate to treat the individual defendants as a group and to presume the false . . . information [publicly] conveyed" were "collective actions of a narrowly defined group of defendants" (Complaint, ¶ 20). The Court disagrees with such an approach.

Group pleading was an accepted practice prior to PSLRA. It was allowed because the courts recognized the difficulty in attributing authorship for corporate statements to a particular defendant in the early stages of litigation. *In Re Bio-Technology Gen. Corp.*, Sec. Litig. 380 F. Supp. 2d 574, 583 (DCNJ 2005).

Although Fed. R. Civ. P. 9(b) required plaintiff to specify "the who, what, when, where, and how: the first paragraph of any newspaper story" in their pleadings, *In re Advanta Corp. Sec. Litig.*, 80 F. 3d 525, 534 (3d Cir. 1999) (quotations and citation omitted), the rule fell short of requiring every material detail to be plead. *In Re Rockefeller Center Properties, Inc., Sec. Litig*, 311 F. 3d 198, 216 (3d Cir. 2002) (quoting *In Re Nice Sys. Ltd. Sec. Litig*. 135 F. Supp. 2d 551, 577 (D.N.J. 2001).

In addition, the Court often relaxed the rigid requirements if it were shown that the requisite factual information is peculiarly within the defendants' knowledge or control. See *In re Exxon Mobil Corp. Sec. Litig.*, 387 F. Supp. 2d 407, 427 (D.N.J. 2005).

Through the enactment of the PSLRA (15 U.S.C. §780-4(b)), Congress has clamped down on judicial mechanisms which permitted more lenient pleading practices to creep into securities fraud cases. The legislative history of the PSLRA explains that the Act's purpose is to encourage the voluntary disclosure of information by corporate issuers, empower investors so that they - and not their lawyers - exercise primary control over private securities litigation, and encourage plaintiffs' lawyers to pursue valid claims and defendants to fight abusive claims. S.Rep. No. 104-98, at 4 (1995). Congress found Rule 9(b) "had not prevented abuse of securities laws by private litigants"; and lawsuits predicated upon a downward spiral of stock prices with little regard to "underlying culpability" should be curtailed. H.R. Conf. Rep. No. 104-367 (1995). The PSLRA "imposes another layer of factual particularity to allegations of securities fraud." *In Re Rockefeller Center Properties, Inc., Sec. Litig*, 311 F.3d 198, 217 (3d Cir. 2002).

The basic tenets of statutory construction explain that a statute must "be construed in such a fashion that *every* word has some operative effect." *Public Lands Council v. Babbitt*, 529 U.S. 728, 746, 120 S.Ct. 1815, 1826, 146 L.Ed.2d 753 (2000) (quoting *U.S. v. Nordic Village, Inc.*, 503 U.S. 30, 36, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992)) (emphasis added). Thus, in crafting the statutory language of 15 U.S.C. § 78u-4(b)(1), regarding misleading statements and omissions, which provides, in relevant part, that "the complaint shall state with particularity *all* facts," Congress clearly intended to give full effect and meaning to the word "all." 15 U.S.C. § 78u-4(b)(1) (emphasis added); see *In re Nice Systems, Ltd. Securities Litigation*, 135 F.Supp.2d 551, 571-72, n. 13

(D.N.J.2001). As a result, plaintiff's showing of fraud must be substantially greater.

Plaintiff must prove that the defendants acted with a particular state of mind. This requires that "the complaint shall, with respect to each act or omission alleged . . . state with particularity the facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). In addition, the PSLRA mandates in actions under Rule 10b-5, that plaintiff establish a strong inference of scienter by stating either: "(1) facts which show that defendants had both motive and opportunity to commit fraud"; or (2) "by setting forth facts that constitute circumstantial evidence of either recklessness or conscious behavior." *Advanta*, 180 F. 3d at 534-35.

With regard to the misleading statements and omissions in question, the PSLRA requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity the facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). This provision requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including "who was involved, where the events took place, when the events took place, and why any statements were misleading." *Rockefeller*, 311 F.3d at 217.

"Group pleading," by its very nature, is contrary to the congressional intent behind the PSLRA. As stated above, it is a method where plaintiffs could name corporate officers as individual defendants without pleading the particulars of their participation in the preparation and dissemination of corporate statements. *In re Bio-Technology Gen. Corp. Sec. Litig.*, 380 F.Supp.2d 574, 583 (D.N.J.2005). Although "the Third Circuit has not expressly determined whether group pleading has survived enactment of the PSLRA . . . the prevailing authority within this District counsels that

group pleading has been abolished." *Id.* at 584; see also *In re PMA Capital Corp. Sec. Litig.*, CA No. 03-6121, 2005 WL 1806503, *12, 2005 U.S. Dist. LEXIS 15696, *41 (E.D.Pa. July 27, 2005); *In re Digital Island*, 223 F.Supp.2d at 553. Although group pleadings may not be a *per se* violation of the PSLRA, the Court finds that group pleadings in this instance cannot be sustained. *In re Rent-Way Secs. Litig.*, 209 F.Supp.2d 493, 518 (W.D.Pa.2002)

The best indication of how the Third Circuit will decide this question is the Court's holding in *In re Advanta*, i.e., that "generalized imputations of knowledge do not suffice" to establish scienter, regardless of the defendant's position with the corporation. *In re Bio-Technology*, 380 F.Supp.2d at 584. Under the PSLRA, allegations based solely on group pleading cannot establish a strong inference of scienter. *Payne v. DeLuca*, 433 F.Supp.2d 547, 569-570 (W.D.Pa. 2006)(citing to *In re Bio-Technology* with approval). See also *In re Cambrex Corp. Sec. Litig.*, No. 03-CV-4896, 2005 WL 2840336 at *15 (D.N.J. October 27, 2005)("group pleading" is impermissible after the passage of the PSLRA); *Winer Family Trust v. Queen*, 2004 U.S. Dist. Lexis 19244 at *17-18 (E.D.Pa. September 27, 2004). Thus, generalized claims that each individual defendant, "by virtue of his high-level position with the Company, directly participated in the management of the Company" or "was privy to confidential proprietary information concerning the Company" are not sufficient to give rise to a strong inference that he acted with the required state of mind. *Payne*, 433 F.Supp.2d at 570 (citing *In re Alpharma*, 372 F.3d at 142). It is apparent that the application of the group pleading doctrine "would circumvent the PSLRA's heightened pleading requirements," and as such, can not be utilized by plaintiff herein. *In re PDI Securities Litigation*, 2005 WL 2009892 (D.N.J. 2005)(quoting *Jones v. Intelli-Check, Inc.*, 274 F.Supp.2d 615, 646 (D.N.J. 2003)). Therefore, each individual's participation and scienter must be pled separately and with particularity.

IV.

In applying the heightened pleading requirements to the individual defendants, the Court recognizes that plaintiff's Complaint, in addition to the group pleading, contains a section entitled "Additional Scienter Allegations Relating to The Individual Defendants." (See Complaint, ¶¶ 139-150). However, this section, spanning 12 paragraphs is woefully deficient to support plaintiff's claims against the individual defendants. While the Court points out certain shortcomings, the following should not be considered an inclusive list of the inadequacies of the pleading. The Court provides the foregoing analysis without prejudice and preserves the right to review the sufficiency of the pleadings should the plaintiff choose to amend and a motion to dismiss is filed again.

*Defendant Lipshes*

Plaintiff attributes several statements to Lipshes, Chief Executive Officer of TTI, which plaintiff maintains were materially misleading. Several of the statements which plaintiff argues are materially misleading appear on their face to be merely vague and general statements of optimism which constitute nothing more than non-actionable puffery, *In re Advanta*, 180 F.3d at 538.

If the Court were to accept such statements as actionable, plaintiff must establish scienter. To show scienter, a plaintiff must "plead [] by alleging facts 'establishing a motive and an opportunity to commit fraud, or by setting forth facts that constitute circumstantial evidence of either reckless or conscious behavior.'" *Id.* at 534-35 (quoting *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 318 n. 8 (3d Cir.1997)).

To demonstrate Lipshes' alleged "reckless or conscious behavior," plaintiffs point to several confidential witnesses. Where a plaintiff attempts to meet the particularity required by Rule 9(b) and PSLRA through reliance upon a confidential source, there are certain standards of review which are

10

applied to the case of such confidential sources.  See *California Public Employees' Retirement System v. Chubb Corp.*, 394 F.3d 126, 146-47 (3d Cir. 2004)("*CALPERS*").  In *CALPERS*, the Third Circuit stated that a complaint relying on confidential sources can satisfy the particularity pleading requirements of Rule 9(b) and the PSLRA by providing "sufficient documentary evidence and/or a sufficient description of the personal sources of the plaintiff's beliefs." *Id.* at 147.  Where documentary evidence does not supply the requisite particularity, use of a confidential source assumes a "heightened importance." *Id.* at 148.  Assessing the particularity of the allegations that rely on confidential sources "entails an examination of the detail provided by the confidential sources, the sources' basis of knowledge, the reliability of the sources, the corroborative nature of other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia." *Id.* at 147.  Where a confidential source is not described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," such allegations fail to supply the requisite particularity to securities fraud claims. *Id.* at 148 (quoting *Novak v. Kasaks*, 216 F.3d 300, 313-14 (2d Cir.2000)).

While plaintiffs appear to sufficiently state when each source was employed by TTI or Hutchinson, when they acquired the information, and how they had access to the information, the actual information that is offered by many of these confidential witnesses do not go to the elements of a 10(b) claim.  Indeed, the substance of some of the information, including opinion allegations among some confidential witnesses, bears questionable relevance to the claims asserted.[1]  Other than

---

[1]Confidential Witness Nos. 6, 7, 8, and 9 are presented to assert allegations regarding other projects, bearing no relation to the alleged misrepresentations that are the subject of this lawsuit, which attempt to paint TTI as a company that habitually pursues business opportunities for which it is unqualified.

stating that Defendant Lipshes visited the Hutchinson site on multiple occasions to attempt to fix the problems, the confidential witnesses offer little information to impute knowledge and demonstrate reckless and/or conscious behavior.

This is not to say that such conscious behavior did not exist, but only to state that such was not adequately pled, as a majority of pleadings were devoted to group pleading, which is insufficient.

### Defendant Ofer

While violations of GAAP standards may provide evidence of scienter, the Complaint must describe the violations with sufficient particularity, e.g., the approximate amount by which revenues and earnings were overstated, the transactions involved, the identities of customers or employees involved in the transactions. *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 203 (1st Cir. 1999). In allegations based on the defendants' violation of GAAP, plaintiff must show "that the accounting judgments which were made were such that no reasonable accountant would have made the same decision if confronted with the same facts." *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir.1994); *Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 563 (6th Cir.2005); *In re IKON Office Solutions*, 277 F.3d at 669. Plaintiff argues that the intentional recognition of $10.3 million in revenue in the first few months of the Hutchinson contract demonstrates a knowing violation of GAAP. Defendants counter that this claim reflects plaintiff's misunderstanding of the percentage of completion accounting method which is permitted under GAAP. The questions of which GAAP principles apply and whether a corporation has violated those principles are questions of fact best left to the analysis of experts later in the course of litigation. *In re Burlington*, 114 F.3d at 1421.

For now, however, the Court is merely faced with the allegation of a violation under GAAP

and left to determine whether a sufficient claim is stated under Section 10(b). Indeed, "a failure to follow GAAP, without more, does not establish scienter." *In re Software Toolworks Inc.*, 50 F.3d 615, 627 (9th Cir.1994). "While it is true that a violation of GAAP will generally not be sufficient to establish fraud, when combined with other circumstances suggesting fraudulent intent, allegations of improper accounting may support a strong inference of scienter." *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 142 F.Supp.2d 589, 608 (D.N.J. 2001); See also *In re Interpool, Inc. Secur. Litig.*, 2005 WL 2000237 (D.N.J. 2005)(citing to *Schoenfeld* with approval).

Plaintiff has adequately pled an allegation of a violation of GAAP. Furthermore, in paragraphs 142 through 145, plaintiffs allege that Defendant Ofer played a direct and intimate role in the accounting of TTI. Plaintiff cites to deposition testimony in an unrelated matter during which Ofer allegedly testified that he received and reviewed invoices, oversaw all signed contracts, oversaw any contractual payment deviations, and issued invoices when disputes arose. CW3 described Ofer as a "virtual one-man show in TTI's accounting department." However, as stated in *Schoenfeld* and *Interpool*, along with the allegations of a GAAP violation, plaintiffs must demonstrate other circumstances suggesting fraudulent intent. No such circumstances have been pled here. A GAAP violation, coupled with Ofer's alleged involvement in the accounting department, is insufficient without a suggestion of fraudulent intent.

### *Defendant Eisenberg*

With regard to Defendant Eisenberg, plaintiffs have failed to allege the necessary elements to hold this defendant liable under Section 10(b). While the Third Circuit has stated that it "will not infer fraudulent intent from the mere fact that some officers sold stock," the Court also stated that sales of company stock by insiders that are "unusual in scope or timing...may support an inference

of scienter." *In re Advanta*, 180 F.3d at 540 (citations and quotation marks omitted). Whether a sale is "unusual in scope" depends on factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *Wilson v. Bernstock*, 195 F.Supp.2d 619, 635 (D.N.J.2002) (citation omitted). Other factors relevant to scope and timing are whether the sales were "normal and routine," and whether the profits were substantial relative to the seller's ordinary compensation. *In re Burlington Coat Factory*, 114 F.3d at 1423. Plaintiff points to Eisenberg's sale of 43,945 shares, nearly 40% of his holdings of TTI stock, during the class period and reporting the sale on September 30, 2002, just one day prior to the profit warning, as sufficient proof of scienter. However, there is no mention as to when during the Class Period these shares were sold, only that they were reported one day prior to the profit warning. Moreover, other than this allegation, Eisenberg is rarely, if at all, mentioned in the Complaint, and any misrepresentation is attributed to him merely through group pleading. *Majer v. Sonex Research, Inc.*, 2006 WL 2038604 (E.D.Pa. 2006)("Group pleading, as opposed to the specific identification of who made alleged misrepresentations, is insufficient under the Reform Act."). Even if the Court were to accept plaintiff's allegations of scienter as to Eisenberg, such allegations, without anything more, do not meet the elements of a claim under Section 10(b) and cannot withstand a motion to dismiss.

### *Defendant Team Software Industries, Ltd.*

Plaintiff seeks to hold Team Software Industries, Ltd. ("Team") liable under the group pleading doctrine. Team, the parent corporation of TTI, according to plaintiff, as a controlling shareholder has a "special relationship" with TTI, and thus, misstatements imputed to TTI should, in the same manner, be imputed to Team. However, as stated above, the group pleading doctrine is

14

not available to plaintiff. Thus, plaintiff's allegations against Team, which include nothing more than it being described as the parent corporation and controlling shareholder, is insufficient under the heightened pleading standards of the PSLRA.

Plaintiff has failed to adequately plead a violation of Section 10(b) and Rule 10b-5 under Rule 9(b) and the PSLRA.

## V.

Plaintiff's Section 20(a) claim against the Individual Defendants is based on the underlying violation of Section 10(b). A corporate officer or director can be liable under Section 20(a) for exercising control over a corporation that has committed securities fraud. *In re Mobile Media Sec. Litig.*, 28 F.Supp.2d 901, 940 (D.N.J. 1998). The Court, however, need not address these arguments. Plaintiff's Section 10(b) claim, necessary as a base of Section 20(a) status, is dismissed, and thus plaintiff's Section 20(a) claim must be dismissed. *In re Cendant Corp. Sec. Litig.*, 76 F.Supp.2d 539, 549 (D.N.J. 1999); See also *Gunter v. Ridgewood Energy Corp.*, 32 F.Supp.2d 166, 178-79 (D.N.J.1998); *Shapiro v. UJB Financial Corp.*, 964 F.2d 272, 279 (3d Cir.1992); *Kennilworth Partners L.P. v. Cendant Corp.*, 59 F.Supp.2d 417, 430 (D.N.J.1999).

## VI.

Federal Rule of Civil Procedure 15(a) provides that "leave to amend shall be freely given when justice so requires." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." *Id.* Here, plaintiff has not acted in bad faith nor has plaintiff acted in an effort to prolong litigation. Furthermore, defendants will not be unduly prejudiced by an amendment. Finally, this Court cannot make the conclusion, based upon the facts before it, that an

amendment as to these defendants would be futile. Therefore, if plaintiff so chooses, the Court will permit plaintiff to file a Second Amended Complaint, abandoning its group pleading and separately pleading the liability of the defendants.

In conclusion, plaintiff's Complaint is dismissed with leave to amend within 30 days.


October 6, 2006                                    PETER G. SHERIDAN, U.S.D.J.


16